**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert CRAIG and Peter V. Pappas,**
**Defendants–Appellants.**

**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Frank P. NORTH, Jr., and Estate of**
**Jack E. Walker,**
**Defendants–Appellees.**

**Nos. 89–1744, 89–1466.**

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1990.

Decided July 16, 1990.

**654**

Kristina M.L. Anderson and Thomas M. Durkin, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Patrick J. Calihan and Edward J. Calihan, Jr., Chicago, Ill., for defendants-appellees.

Before WOOD, Jr. and POSNER, Circuit Judges, and CRABB, District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

This case began almost twenty years ago with a scandal in the Illinois General Assembly. For their roles in the scandal, the four individual defendants were variously convicted of mail fraud and travel in interstate commerce with intent to promote an unlawful activity. *See* 18 U.S.C. §§ 1341, 1952. These defendants now have petitioned for a writ of error coram nobis, asking that their convictions be vacated in light of the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The district granted the writ as to Frank P. North, Jr., and the Walker estate but denied the writ as to Robert Craig and Peter V. Pappas. *Craig v. United States*, 703 F.Supp. 730 (N.D.Ill.1989). As to the Walker estate, we dismiss this case for want of jurisdiction. Because we find coram nobis relief is inappropriate as to the other defendants, we reverse in part and affirm in part.

## I. FACTUAL BACKGROUND

One cubic yard of ready-mix concrete weighs about four thousand pounds, and in 1971, representatives of the ready-mix cement industry wanted to increase the legal load limits of industry trucks by this amount. To meet this goal, the ready-mix industry trade association engaged appellant Pappas as their attorney. Pappas told the trade association that passage of the legislation would cost $5,000 for his fee plus an unspecified amount of money in the future. The unspecified amount soon became $50,000, payable to members of the Illinois legislature.

Terms of payment were then made an issue: was it enough for the bill merely to clear the Illinois General Assembly or did the governor have to approve the legislation before the money became due? An uneasy compromise was reached, and both houses of the General Assembly passed the bill. Not a party to the scheme, the governor then vetoed the proposed legislation, obviously believing that it was not in the best interest of the state of Illinois to have cement trucks rumbling over its highways four thousand pounds heavier. The Gener-

---

[*] The Honorable Barbara B. Crabb, Chief Judge for the Western District of Wisconsin, is sitting by designation.

al Assembly never attempted to override the veto, and the bill never became a law.

Unhappy with the result, the trade association balked at paying anything to state legislators. Because of the unfavorable results, the state legislators offered a discount and agreed to accept only $30,000 for services rendered. Eventually, $15,000 was distributed to various members of the Illinois General Assembly.

For their role in this scandal as members of the General Assembly, a federal district court convicted Craig, North, and Walker of mail fraud; attorney Pappas received similar treatment. In addition, Pappas and Craig were convicted of violations of the Travel Act, 18 U.S.C. § 1952, for causing a member of the trade association to travel to Indiana for the purpose of soliciting bribe money from other trade association members. Pappas received a ten-year sentence and a $10,000 fine; Craig, North, and Walker received five-year sentences and $5,000 fines. On appeal, we affirmed the convictions. *United States v. Craig*, 573 F.2d 455 (7th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). All four petitioners served their terms of imprisonment, but only Craig completed payment of his fine.

The government sought the mail fraud convictions under the intangible rights theory—that the petitioners had devised a scheme to defraud the citizens of the state of Illinois of their right to the petitioners' loyal, faithful, and honest service as public officers, public employees, and members of the Illinois General Assembly. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court condemned this theory of prosecution, prompting a spate of coram nobis petitions to vacate previous convictions. The petitioners are no exception. Asking that their convictions be vacated, they filed a petition for a writ of error coram nobis with the district court. Because Walker

has passed away, his estate has petitioned for relief.

Finding a plethora of continuing civil disabilities for convicted felons in the Illinois statutes, the district court granted coram nobis relief to petitioner North. The Walker estate also received relief on the grounds that Walker's felony conviction precluded his widow from collecting state pension benefits. As to petitioners Craig and Pappas, however, the district court ruled that their invalid mail fraud convictions did not taint their convictions under the Travel Act. Because the valid Travel Act conviction would support any lingering civil disabilities, *see United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989), the district court denied Craig's and Pappas's petitions. Both the government and the petitioners have appealed from the district court's judgments that were adverse to them.

## II. JURISDICTION

### A. *Appellate Jurisdiction*

■ We first pause at a jurisdictional question that neither party brought to the attention of this court. To avoid becoming mired in a swamp of dates, it is sufficient to note that we have appellate jurisdiction over both the government's and the petitioners' appeals only if FED.R.APP.P. 4(a)'s time limits for appeals in civil cases apply. If FED.R.APP.P. 4(b)'s time limits for appeals in criminal cases apply, then both the government's and the petitioners' notices of appeal were untimely, and we have no jurisdiction to hear this case. Thus, the question is which set of time limits should govern coram nobis appeals. Two courts of appeals have applied the time limits for criminal appeals, *Yasui v. United States*, 772 F.2d 1496, 1498–99 (9th Cir.1985); *United States v. Mills*, 430 F.2d 526, 528 (8th Cir.1970), *cert. denied*, 400 U.S. 1023, 91 S.Ct. 589, 27 L.Ed.2d 636 (1971),[1] and

---

1. Although both the *Yasui* and *Mills* courts applied the ten-day period for criminal appeals, neither court allowed their holdings to forfeit the defendant's right of appeal. In *Mills,* the court construed the district court's acceptance

of the untimely notice of appeal as a grant of additional time for the defendant to proceed with his appeal, *see* 430 F.2d at 528, and rejected the coram nobis petition on its merits, *see* 430 F.2d at 528–31. In *Yasui,* the court remanded

two have applied the time limits for civil appeals, *United States v. Cooper*, 876 F.2d 1192, 1193–94 (5th Cir.1989) (per curiam); *United States v. Keogh*, 391 F.2d 138, 140 (2d Cir.1968). We will break the tie and apply the time limits for civil appeals. .

It is tempting to resolve this issue as a matter of semantics. In *United States v. Morgan*, 346 U.S. 502, 505 n. 4, 74 S.Ct. 247, 249 n. 4, 98 L.Ed. 248 (1954), the Supreme Court made a passing reference that a motion for a writ of error coram nobis "is a step in the criminal case." From this remark, two courts have deemed that an appeal from such a motion falls under rule 4(b)'s heading of "Appeals in Criminal Cases" and is therefore governed by a ten-day time limit. *See Yasui*, 772 F.2d at 1499; *Mills,* 430 F.2d at 528. It is similarly unsatisfying to classify a coram nobis proceeding as civil and conclude that appeals from a motion for a writ of error coram nobis fall under rule 4(a)'s heading of "Appeals in Civil Cases." *See* 9 J. Moore, B. Ward & J.D. Lucas, Moore's Federal Practice ¶ 204.15, at 4–132 to –133 (2d ed. 1990) (applying this approach). Rather than decide which set of rules applies on the basis of labels, it is better to decide the issue in light of the particular rule in question.

For example, in *United States v. Balistrieri*, 606 F.2d 216 (7th Cir.1979), *cert. denied*, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980), we examined the need for evidentiary material in a coram nobis proceeding and determined that it was more appropriate to afford the district judge the broad discretion in monitoring discovery that comes with the Federal Rules of Civil Procedure. We observed that a coram nobis proceeding is " 'a hybrid action: quasi-civil and quasi-criminal.' " *Id.* at 221 (quoting *United States v. Tyler*, 413 F.Supp. 1403, 1404–05 (M.D.Fla.1976)). We will again follow this approach. Instead of broadly classifying a coram nobis action as criminal or civil and reasoning from there, we only decide whether it is more appropriate to apply civil or criminal rules to a coram nobis petition in the context of the timeliness of a notice of appeal.

The Federal Rules of Appellate Procedure provide for a thirty-day, sixty days if the government is a party, time limit for appeals in civil cases and a ten-day, thirty days if the government exercises a right to appeal, time limit for appeals in criminal cases. *See* Fed.R.App.P. 4. The shorter time limit for criminal appeals furthers the public interest in the prompt resolution of criminal proceedings. Neither the interests of society nor of individual criminal defendants are served by a plodding appellate process that could change the results of a trial, often while the defendant has already begun to serve a sentence of incarceration. Indeed, as witnessed by the sixth amendment and the Speedy Trial Act, rule 4(b) is just a small part of a larger scheme to ensure that criminal prosecutions do not plod on indefinitely. *See United States v. Hammad*, 709 F.Supp. 334, 336 n. 3 (E.D. N.Y.1989), *aff'd*, 902 F.2d 1062 (2d Cir. 1990).

A petition for a writ of error coram nobis does not present the same concerns. Coram nobis petitions are brought only after a convicted defendant's release from federal custody. *See United States v. Bush*, 888 F.2d 1145, 1147 (7th Cir.1989). Thus, there is no societal or individual interest in prompt adjudication of the petition while a prisoner is languishing in jail. Where the government is appealing a district court's grant of a writ of error coram nobis, the policies of rule 4(b) are even more removed. The short time limits in rule 4(b) are harsh, and where the policies behind it do not apply, the more relaxed time limits of rule 4(a) should govern the timing of the notice of appeal.

This holding allows a coram nobis petitioner the same time for appeal as a federal prisoner attacking his sentence under section 2255. Section 2255 Rule 11 & advisory committee note. The time limits for civil

---

the case back to the district court for a finding of whether the appellant could make a showing of excusable neglect for failing to file a timely notice of appeal. 772 F.2d at 1499–1500. Even-

tually, the *Yasui* case was dismissed as moot, because the defendant passed away during the proceedings. *See Hirabayashi v. United States*, 828 F.2d 591, 594 n. 4 (9th Cir.1987).

appeals govern a section 2255 motion, even though a section 2255 motion, much like a coram nobis petition, is considered a continuation of a criminal proceeding. *See* SECTION 2255 RULES 1 & 11 advisory committee notes. In the past, we have even analogized a petition for a writ of error coram nobis to a section 2255 motion. *See United States v. Scherer*, 673 F.2d 176, 178 (7th Cir.), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982); *United States v. Hedman*, 655 F.2d 813, 817 (7th Cir.1981). Because a section 2255 motion closely resembles a petition for a writ of error coram nobis, it is best to treat them consistently for the timing of a notice of appeal. *See Cooper*, 876 F.2d at 1194.

We hold that the time limits for civil appeals in FED.R.APP.P. 4(a) govern an appeal from a district court order denying or granting a petition for a writ of error coram nobis. Because both the government and the petitioners met the time limits for a civil appeal, we have jurisdiction to hear the merits of their cases.

## B. *Standing of the Walker Estate*

■ One of the petitioners, however, cannot meet the standing requirements to have a case heard in federal court. Accordingly, we do not have jurisdiction to hear that part of the appeal. In *United States v. Kerner*, 895 F.2d 1159 (7th Cir. 1990), we held that a decedent's estate lacked standing to bring a coram nobis petition on behalf of the decedent, and that holding is dispositive of the Walker estate's appeal.

In *Kerner*, the estate of a late governor of Illinois brought a coram nobis petition to expunge his convictions for mail fraud, perjury, false statements, and tax fraud. Although we determined that the estate met the article III standing requirements, we found that the estate failed to satisfy the court-imposed prudential limitations on the exercise of jurisdiction. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). First, we believed that the estate's interests fell outside of the zone of interests protected by the writ of error coram nobis. 895 F.2d at 1162–63. Second, we held that the estate was impermissibly trying to assert the rights of a third party, namely the rights of the decedent to seek a writ of error coram nobis. *Id.* at 1163.

Predictably, the Walker estate attempts to distinguish its situation from that of the Kerner estate. The Walker estate argues that unlike *Kerner*, Walker's widow is still alive and would be entitled to pension benefits if Walker's conviction is expunged. This argument misses the point. By refusing to hear an estate's petition for a writ of error coram nobis, *Kerner* implicitly holds that the right to seek the writ belongs to the wrongfully convicted individual and dies with that individual. Only one entity could have sought a writ of error coram nobis for Jack Walker, and that entity was Jack Walker himself, before his death.

Furthermore, the Walker estate's petition for a writ of error coram nobis presents standing problems that even go beyond those considered in *Kerner*. The Kerner estate was at least trying to remedy a cognizable injury to itself: it claimed $90,000 worth of injury in the form of fines, penalties, back taxes, and pension forfeiture it lost as a result of the felony conviction. 895 F.2d at 1161–62. The Walker estate is not even trying to remedy an injury to itself; it wants to expunge Walker's felony conviction so that Walker's widow can receive pension benefits. Not only is the Walker estate trying to assert legal rights that belonged to Jack Walker the individual, but it is also trying to assert the rights of Walker's widow. If Mrs. Walker has been wrongfully deprived of her own vested pension benefits, her right to recover those benefits is in a forum different than a petition for a writ of coram nobis by her late husband's estate.

## III. DISCUSSION

■ In our recent coram nobis decisions, we have emphasized that to be successful, the petitioner needs to show lingering civil disabilities from his allegedly wrongful conviction. *See United States v. Bush*, 888

F.2d 1145 (7th Cir.1989); *United States v. Keane,* 852 F.2d 199 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989). At issue in this case is what it means for a coram nobis petitioner to show that he still suffers from a civil disability.

We do not write on a clean slate in making our decision. In *Bush,* we held that a coram nobis petitioner's desire to obtain a desirable job did not constitute a civil disability. 888 F.2d at 1149. In *Keane,* we held that the possibility of recovering a fine was also not enough to justify coram nobis relief. 852 F.2d at 204. The petitioners in both *Keane* and *Bush* still suffered the adverse effects of their erroneous convictions, but we recognized that our legal system must tolerate the chance of error in order to function. *See Keane,* 852 F.2d at 206. The continual reexamination of old convictions "subtracts from the time available to deal with festering grievances" of today. *Bush,* 888 F.2d at 1150. Considering these systemic interests in finality, we have rejected coram nobis petitions except where there is a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to the petitioner. Thus, the types of disabilities sufficient to justify coram nobis relief can be broken down into three elements. First, the disability must be causing a present harm; it is not enough to raise purely speculative harms or harms that occurred completely in the past. Second, the disability must arise out of the erroneous conviction.[2] Third, the potential harm to the petitioner must be more than incidental.

As an excellent example of a disability justifying coram nobis relief, we need not look any further than the Supreme Court's opinion resurrecting the writ in *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954). In *Morgan,* the coram nobis petitioner had earlier pleaded guilty to a federal crime and had served a four-year prison sentence. *Id.* at 503, 74 S.Ct. at 248. Once out of federal custody, the petitioner returned to his wicked ways, running afoul of New York state authorities. Because of his previous federal conviction, the petitioner received an enhanced sentence in state court. *Id.* at 503–04, 74 S.Ct. at 248–49. The petitioner alleged that he never waived counsel in his federal prosecution and, consequently, the conviction was invalid. Because the petitioner could not challenge the federal conviction in New York state courts, *see id.* at 504, 74 S.Ct. at 248–49, the Supreme Court held that a writ of error coram nobis would be an appropriate remedy, *id.* at 512–13, 74 S.Ct. at 253–54. In similar situations, we have also commented that a writ of error coram nobis would be appropriate relief. *See, e.g., Crank v. Duckworth,* 905 F.2d 1090, 1091 (7th Cir.1990); *Lewis v. United States,* 902 F.2d 576, 577 (7th Cir.1990); *Lowery v. Young,* 887 F.2d 1309, 1313 (7th Cir.1989); *Hicks v. Duckworth,* 856 F.2d 934 (7th Cir.1988). The three elements of a civil disability all apply to a coram nobis petitioner serving an enhanced sentence because of an allegedly erroneous conviction in another jurisdiction. First, the petitioner is clearly suffering a present harm by languishing in jail. Second, the erroneous conviction has enhanced the petitioner's sentence and thereby caused the harm. Third, enduring a longer prison sentence than justified by law is certainly more than incidental harm. While not the only grounds for coram nobis relief, the facts in *Morgan* provide an instructive example of an appropriate situation for the writ.

Our restrictive view of the writ's availability is not shared by all circuits. Both the Fourth and Ninth Circuits apparently do not require any showing of a disability before a writ of error coram nobis may issue. *See United States v. Walgren,* 885 F.2d 1417, 1421 (9th Cir.1989) (applying "liberal" presumption that all criminal convictions carry adverse consequences); *United States v. Mandel,* 862 F.2d 1067, 1075 & n. 12 (4th Cir.1988) (all felony convictions impose a status upon the person),

---

**2.** This second requirement is also reflected in our rule that if an indictment states one valid offense, then no coram nobis relief is available,

"for a single felony conviction supports any civil disabilities...." *Keane,* 852 F.2d at 205.

*cert. denied,* —— U.S. ——, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989); *Hirabayashi v. United States,* 828 F.2d 591, 606–07 (9th Cir.1987) ("Any judgment of misconduct has consequences for which one may be legally or professionally accountable."); *see also United States v. McClelland,* 732 F.Supp. 1534, 1537 (D.Nev.1989) ("In the Ninth Circuit, there is no need for petitioner to show specific adverse consequences that he presently is suffering or that he is likely to suffer in the future.") In dictum, however, the Third Circuit has hinted that it might follow our more restrictive view. *See United States v. Osser,* 864 F.2d 1056, 1060 (3d Cir.1988) (admitting to some uncertainty as to whether the loss of a pension is a sufficient disability). We noted these differences in *Bush* and observed that the Supreme Court has obviously believed this split among the circuits tolerable. 888 F.2d at 1148–49. Just as we did before, we will continue to adhere to our own precedents until the Supreme Court changes the law or cogent argument convinces us otherwise.[3] *Id.* at 1149.

■ Turning to the petitioners in the present case, we find that none of them have advanced civil disabilities that would justify the issuance of the writ. The most compelling argument raised is that Pappas seeks the return of his license to practice law. After his conviction, the Illinois Supreme Court disbarred Pappas. *See In re Pappas,* 92 Ill.2d 243, 442 N.E.2d 142, 65 Ill.Dec. 831 (1982). In *Keane,* we suggested that "this sort of civil disability could support the issuance of the writ," 852 F.2d at 203, but Pappas has not shown either that his conviction is a direct cause of his disbarment or that he has a present desire to apply for reinstatement to the bar.[4] Pappas has not brought to our attention any pending applications for his reinstatement to the Illinois bar, making the possibility of harm only speculative. Even if he had made such an application, coram nobis relief still would not be appropriate. The Illinois disciplinary rules for lawyers soon to go into effect and those in effect at the time of Pappas's disbarment do not discipline lawyers solely for a conviction; they punish for the conduct underlying the conviction. *See* Order of Supreme Court of the State of Illinois on Feb. 8, 1990, rule 8.4, 1990 Ill.Legis.Serv., at R–1 to R–30 (West) (to be codified at ILL.REV.STAT. ch. 110A, following ¶ 776); ILL.REV.STAT. ch. 110A, rules 1–102(a)(3)–(4), 9–101(b) (1987); *see also* ILL.SUP.CT.R. 767(f) (setting forth grounds for reinstatement, none of which include the overturning of a conviction). A writ of error coram nobis could vacate Pappas's conviction, but it could not change the record. Although perhaps not illegal under *McNally,* Pappas's role in the scandal certainly provides grounds for his disbarment. The Illinois Supreme Court is well-equipped to consider the effect of *McNally* on any

---

**3.** In taking its less restrictive stance, the Ninth Circuit relied on language in *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). In *Sibron,* the Supreme Court stated that all criminal convictions were presumed to carry adverse consequences, *id.* at 55–56, 88 S.Ct. at 1898–99, but this language must be viewed in its context. The Court was discussing the showing that a criminal defendant must make to prevent his case from becoming moot on direct appeal, and a direct appeal does not present the same finality concerns that arise on a petition for a writ of error coram nobis. The *Sibron* Court only held that the completion of the sentence does not render a criminal appeal moot, *id.* at 50–58, 88 S.Ct. at 1896–1900, and its decision is inapposite to the issue in this case. Clearly, the completion of sentence does not render a coram nobis petition moot, for that is the only time that such a petition can be brought. The issue here is not mootness but what conditions justify the expenditure of judicial resources to grant the extraordinary writ of error coram nobis. We do not suggest that Craig, Pappas, and North could not have had their cases heard on direct appeal but only that their situation does not justify the issuance of a writ of error coram nobis.

**4.** In his briefs to this court and the district court, Pappas did make several self-serving statements that he desired to seek reinstatement to the Illinois bar. These statements hardly constitute reliable evidence of Pappas's intent. *See Morrison v. Duckworth,* 898 F.2d 1298, 1299 n. 1 (7th Cir.1990) (statements in briefs may not be used to supplement the record). Nevertheless, Pappas could not have simply cured this problem by filing an affidavit and swearing to his intent to seek reinstatement. As explained in the text, the requirement that the threat of harm from the civil disability be immediate requires more than a mere desire to seek reinstatement to the bar.

application Pappas would submit, and there is no indication that a writ of error coram nobis would lead the court to reinstate Pappas to the practice of law.

 As former members of the Illinois General Assembly, both Craig and North assert that a writ of error coram nobis would entitle them to receive legislators' pension benefits taken from them upon conviction. We first note that despite their convictions, Craig and North were entitled to a refund of any contributions they had paid into the pension fund. *See* ILL.REV. STAT. ch. 108½, ¶ 2–156. By virtue of this refund, Craig and North were effectively removed at the time of their conviction as participants in the legislators' pension plan, and basically, they are now asking to be reinstated as plan participants. Any harm to Craig and North for their removal from the pension plan occurred entirely in the past. As we noted above, a writ of error coram nobis is inappropriate where the civil disabilities do not threaten present harm. We think that Craig and North's removal from the pension plan is a sunk cost, much like a criminal fine. If Craig and North lost their right to participate in the pension plan through a 1975 civil judgment, it could not be reexamined at this late date. Just as the possibility of recovering a fine is insufficient to justify the issuance of the writ, *see Keane*, 852 F.2d at 204, so is the possibility of recovering lost pension benefits.

 Finally, Craig, North, and Pappas all point toward a cornucopia of disabilities that the Illinois statutes have in store for convicted felons.[5] These disabilities range from the possibility of impeachment as a witness, *see* ILL.REV.STAT. ch. 110, ¶ 8–101, to possible ineligibility for a cigarette distributor's permit, *see* ILL.REV.STAT. ch. 120, ¶ 453.4b(2). For most of these disabilities, it is enough to observe that they are speculative possibilities at best; there has been no showing that any of these disabilities will cause any of the petitioners to suffer a

present harm. A few of these disabilities, however, merit further comment. As to the right to vote, none of the petitioners have alleged that they are currently unable to vote, probably because section 2 of article III of the Illinois Constitution restores the right to vote to felons who have completed their sentences.[6] Recognition of possible future criminal sentence enhancements as grounds for coram nobis relief would be tantamount to judicial recognition that the petitioners intend to commit more crimes—a possibility we absolutely refuse to acknowledge until it occurs. Finally, Craig and North assert that their tainted federal convictions wrongfully deprived them of their seats in the Illinois legislature, a classic example of a past harm that a writ of error coram nobis could not or should not remedy.

## IV. CONCLUSION

We have reaffirmed our holding that estates lack standing to bring coram nobis petitions on behalf of their decedents. We have also stuck to our precedents on coram nobis petitioners' need to show continuing disabilities from their allegedly erroneous convictions. Because we found all of the petitioners' disabilities lacking merit, we have declined to reach the government's alternate argument that Craig's and Pappas's Travel Act convictions can stand independent of any invalid mail fraud counts. Accordingly, the Walker estate's appeal is dismissed for want of subject-matter jurisdiction; the judgment of the district court denying a writ of error coram nobis to Robert Craig and Peter V. Pappas is affirmed; and the judgment of the district court granting a writ of error coram nobis to Frank P. North, Jr., is reversed.

DISMISSED IN PART, AFFIRMED IN PART, AND REVERSED IN PART.

---

5. Upon our examination of the statutes cited to us by the petitioners, we found that several of these statutes had long been repealed.

6. We also note that ILL.REV.STAT. ch. 38, ¶ 1005–5–5 automatically restores, after completion of a term of imprisonment, rights and privileges lost upon conviction.