896 F.Supp. 1451 (1995)
Leonard Ray BLANTON, Petitioner,
v.
UNITED STATES of America, Respondent.
No. 3:91-0991.
United States District Court, M.D. Tennessee, Nashville Division.
August 15, 1995.
*1452 *1453 William M. Roberts, Memphis, TN, Russell C. Winston, Memphis, TN, Hallie A. Plitman, Dann & Associates, Memphis, TN, for plaintiff Blanton.
Robert C. Watson, Rosemary A. Hart, Office of the United States Attorney, Nashville, TN, for U.S.
Michael William Catalano, Office of the Attorney General, Nashville, TN, for movants Tennessee Bd. of Professional Responsibility, Tennessee Bd. of Law Examiners.
Alfred H. Knight, Willis & Knight, Nashville, TN, for intervenor Combined Communication Corp.

Memorandum Opinion
BAILEY BROWN, Senior Circuit Judge, sitting by designation.
The petitioner, former governor of Tennessee Leonard Ray Blanton, has brought a petition for a writ of error coram nobis asking this court to vacate his 1981 conspiracy and Hobbs Act convictions. He contends that his Sixth Amendment rights were violated because, among other things, his lead attorney was never licensed to practice law. For the reasons that follow, we dismiss the petition.

I.
The conviction which Blanton has repeatedly challenged arose out of a scheme to distribute liquor licenses in exchange for kickbacks. According to the original Sixth Circuit panel which heard Blanton's first appeal:
Blanton's role in the scheme allegedly was that he directed that liquor licenses be awarded to political friends or persons like Ham who offered a cut of the profits.... Blanton allegedly agreed to an illegal twenty percent cut of the profits of Ham's liquor store, with the payment coming in the form of Ham's purchase of allegedly worthless oil stock from Blanton for $23,000.
United States v. Blanton, 700 F.2d 298 (6th Cir.1983).
Because of this and other activities, Blanton was indicted in 1980 for conspiracy, 18 U.S.C. § 371, nine counts of mail fraud and aiding and abetting mail fraud, 18 U.S.C. §§ 1341 & 2, and one count of extortion and aiding and abetting extortion. 18 U.S.C. §§ 1951 & 2, § 1951 being known as the Hobbs Act.[1] A codefendant, Clyde Edward Hood, who had been special assistant to Blanton, was indicted for conspiracy, ten counts of mail fraud, and one count of extortion, as well as aiding and abetting mail fraud and extortion. James M. Allen, another codefendant, who had been special consultant to the governor, was indicted for conspiracy, ten counts of mail fraud, and one count of extortion, as well as aiding and abetting mail fraud and extortion. In the conspiracy count, the defendants were charged with conspiring to violate both the mail fraud and extortion statutes.
All three of the then-district judges in the Middle District of Tennessee recused themselves, and therefore the Chief Judge of the Sixth Circuit designated Honorable John W. Peck of the Court of Appeals to preside. After numerous pretrial issues were raised by defendants and disposed of by Judge Peck, the trial began on April 20, 1981. After the jury had been selected and seated and opening statements had been made, Judge Peck's wife became seriously ill with the result that the writer of this opinion was designated to replace Judge Peck as trial judge. On June 9, a verdict was rendered. Blanton was convicted of conspiracy, nine counts of mail fraud, and one count of extortion. Hood was convicted of conspiracy and six counts of mail fraud.[2] Allen was convicted *1454 of conspiracy and seven counts of mail fraud.[3]
On August 14, 1981, Blanton was sentenced to imprisonment for a period of three years on each count, to run concurrently, and fined $1,000 on each count for a total fine of $11,000. Hood was sentenced to imprisonment for eighteen months on each count, to run concurrently, and fined $2,000 on each count for a total fine of $14,000. Allen was sentenced to imprisonment for two years on each count, to run concurrently, and fined $2,000 on each count for a total fine of $14,000.[4]
On appeal of the judgments of conviction, a panel of the court of appeals reversed the convictions of Blanton, Hood and Allen for the reason, and only for the reason, that the voir dire of the jury had been improperly conducted. Blanton, 700 F.2d 298 (6th Cir. 1983). However, the court of appeals then voted for en banc consideration, determined that the conduct of the voir dire of the jury did not contain reversible error and affirmed the convictions. United States v. Blanton, 719 F.2d 815 (6th Cir.1983). The Supreme Court denied certiorari. 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984).
The court of appeals later affirmed a decision by this court not to grant a motion of Blanton and Allen for a new trial based on newly discovered evidence. United States v. Allen, 748 F.2d 334 (6th Cir.1984).
After the decision by the Supreme Court in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Court amended the accepted doctrine as to the application of the mail fraud statute,[5] Blanton, Hood, and Allen, who had served their sentences, moved to have their convictions set aside, and in the case of Hood and Allen, who had paid their fines, for a refund of the fines.[6]
We concluded, in an opinion filed on January 28, 1988, that the petitioners were correct as to the effect of the decision of the Court in McNally, and that all petitioners were entitled to have their convictions of mail fraud vacated. With respect to the conspiracy convictions of Hood and Allen, the government agreed that, because they had not been convicted of a violation of the Hobbs Act, if the indictment did not, under McNally, charge a conspiracy to violate the mail fraud statute or charge a substantive violation of that statute, Hood and Allen were entitled to relief as to both the conspiracy and mail fraud counts. The order that was entered, accordingly, vacated the judgment of conviction as to Hood and Allen as to the conspiracy count and the mail fraud counts. However, with respect to Blanton, we determined that, because he was convicted of a violation of the Hobbs Act as well as conspiracy to violate that statute, his convictions of a violation of the Hobbs Act and conspiracy to violate the Hobbs Act must stand.
The government appealed the decision as to Allen and the court of appeals affirmed. Allen v. United States, 867 F.2d 969 (6th Cir.1989). It also appealed the decision as to Hood, which decision was affirmed by an order, entered February 16, 1989, relying on its reported opinion in Allen. The government appealed the decision of this court vacating the judgment of conviction of Blanton as to mail fraud, and Blanton appealed the denial of his petition to vacate his conviction *1455 of conspiracy and violating the Hobbs Act. These appeals were, however, dismissed by agreement between the parties, and Blanton stands and remains convicted of conspiracy to violate the Hobbs Act and of violating the Hobbs Act.
This brings us to the present petition, Blanton's third collateral attack on his conviction. On December 4, 1991, Blanton filed a petition for a writ of error coram nobis, asking that this court vacate his remaining convictions.[7] In it, Blanton claimed he received ineffective assistance of counsel at his trial because his attorneys: (1) allowed him to testify after a two-martini lunch; (2) used a clairvoyant to aid in jury selection; (3) did not inform him of the seriousness of the charges against him; (4) inadequately prepared him for trial; and (5) did not call an expert witness to testify to the value of the allegedly worthless stocks. In a prior order, filed August 2, 1992, we dismissed these claims as either frivolous or nonprejudicial, and we will not revisit them here.
This opinion, rather, deals with Blanton's amended petition. Essentially, he claims that John S. McLellan, Jr., one of his attorneys (he had three), was never licensed to practice law.[8] Therefore, it is claimed, he was not represented at trial by "counsel" within the meaning of the Sixth Amendment, and, accordingly, his conviction should be vacated. We disagree, and dismiss his petition for three separate reasons: (1) The petitioner is not entitled to a writ of error coram nobis because he does not have a continuing civil disability; (2) assuming arguendo that McLellan was not actually licensed, a conviction may still be valid under the Sixth Amendment so long as the defendant is represented by a competent advocate who does not have a conflict of interest; and (3) in the interest of state/federal comity, and for prudential reasons, we refuse to second guess the Tennessee Supreme Court's decision to authorize McLellan to practice law in its state.

II.
As stated, the petitioner's only remaining claim is brought under the ancient doctrine of writ of error coram nobis ("error before us"). The Supreme Court, in United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), established that under the authority of the All-Writs Act, 28 U.S.C. § 1651(a), federal courts may review alleged errors of fact committed in the original criminal proceeding, and if the circumstances dictate, may vacate the conviction even though the petitioner has completely served the sentence. The writ of error coram nobis is an extraordinary writ that provides extraordinary relief, however, and should be granted only under compelling circumstances. See Flippins v. United States, 747 F.2d 1089, 1091 (6th Cir.1984) (holding that a petitioner must in general demonstrate "(1) an error of fact, (2) unknown at the time of trial, (3) of a fundamentally unjust character which probably would have altered the outcome of the challenged proceeding if it had been known.").[9]
Generally, a writ of error coram nobis affords similar relief as that relief sought under a writ of habeas corpus. Howard v. United States, 962 F.2d 651, 653 (7th Cir. 1992). However, while a writ of habeas corpus requires that the petitioner be "in custody" for relief, coram nobis has no "in custody" requirement and, as stated, may be invoked after the defendant has served the sentence. As a substitute for the "in custody" requirement, a majority of courts require that the petitioner show that he suffers from an ongoing civil disability or an adverse collateral consequence because of the allegedly wrongful conviction. See United States v. Bush, 888 F.2d 1145, 1148 (7th Cir.1989); United States v. Drobny, 955 F.2d 990 (5th *1456 Cir.1992); United States v. Marcello, 876 F.2d 1147, 1154 (5th Cir.1989) (ongoing civil disability a necessary condition for issuing the writ); United States v. Osser, 864 F.2d 1056, 1059-60 (3rd Cir.1988). Thus, a petitioner must allege "a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to petitioner." United States v. Craig, 907 F.2d 653, 658 (7th Cir.1990), cert. denied, 500 U.S. 917, 111 S.Ct. 2013, 114 L.Ed.2d 100 (1991).
This burden is placed on a coram nobis petitioner because all collateral attacks significantly and detrimentally impact on society's interest in the finality of criminal convictions, and there is no compelling reason to bend the rule of finality when custody or some other form of liberty or property is not at stake. Courts must conserve their limited time and resources to resolve the claims of those who have yet to receive their first day in court much less their first decision. We therefore agree that some ongoing civil disability is a necessary condition before a coram nobis petitioner is entitled to relief. Such a position is consistent with the history of the writ. Without such a safeguard, the doctrine of finality would be significantly diminished through the writ's frequent and potentially abusive use.
Our question then becomes what constitutes an ongoing civil disability? Because error coram nobis petitions are of such an extraordinary nature, we have very few cases lending us guidance. The Seventh Circuit has set out that the disability must have three elements: (1) the disability must be causing a present harm; purely speculative harms or harms in the past are insufficient, (2) the disability must arise out of an erroneous conviction, and (3) the potential harm must be more than incidental. Craig, 907 F.2d at 658. Some examples of what could constitute an ongoing civil disability under the appropriate circumstances are fairly straightforward, such as the loss of the right to vote, hold occupational licenses (i.e., law licenses), the right to bear arms, and the imposition of a subsequent criminal sentence that has been enhanced as a result of the challenged conviction. Id. at 659; United States v. Keane, 852 F.2d 199, 203 (7th Cir. 1988), cert. denied, 490 U.S. 1084, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989). On the other hand, a fine levied pursuant to the conviction, the injury of reputation, or the stigma associated with a conviction do not constitute ongoing civil disabilities. Bush, 888 F.2d at 1148 ("[T]o treat effects common to all litigation as civil disabilities would be to eliminate the custody requirement [as in habeas] without leaving anything in its stead.") Likewise, the mere possibility that the conviction in question could affect or enhance future sentencing is merely speculative and is not a present ongoing civil disability sufficient for error coram nobis relief.[10]
Although the Sixth Circuit has not explicitly addressed the ongoing civil disability requirement at length, we think this ruling is not inconsistent with the Sixth Circuit's prior treatment of error coram nobis petitions. This is clearly illustrated in Flippins v. United States, 747 F.2d 1089 (6th Cir.1984). In Flippins, the petitioner was serving a sentence under Kentucky law for being a persistent felony offender. Flippins sought to use coram nobis to challenge the federal conviction that had formed the predicate for his sentence in the Kentucky state court. Flippins contended that he received ineffective assistance of counsel in the federal proceeding because (1) his attorney had never met with him prior to the day he pleaded guilty, and (2) his attorney coerced him into entering a guilty plea by promising him a reduced *1457 or suspended sentence. Ultimately, the court held that the petition warranted a hearing because, if the federal conviction were vacated, the Kentucky sentence would be reduced. The length of his state court sentence, therefore, was directly affected by the federal conviction which he was seeking to challenge by coram nobis. Flippins' enhanced state sentence clearly constituted an ongoing civil disability. See also Pitts v. United States, 763 F.2d 197, 198 (6th Cir. 1985) (court noted that the petitioner was suffering the ongoing disability of an enhanced state court sentence in finding coram nobis relief appropriate); Gareau v. United States, 474 F.2d 24 (6th Cir.1973) (court explained that the "collateral consequences of appellant's federal conviction demonstrate that his claim is not moot" where petitioner challenged the federal conviction that had led to an enhanced state court sentence); but see Allen v. United States, 867 F.2d 969 (6th Cir.1989) (allowing petition for writ of error coram nobis to expunge mail fraud convictions in light of McNally without a showing of an ongoing civil disability, but where neither the government nor the court of appeals raised the issue).
The government contends that the coram nobis petition should be dismissed because Blanton cannot show an ongoing civil disability. Blanton responds that the alleged deprivation of assistance of counsel constitutes an ongoing civil disability sufficient to warrant coram nobis relief. In an attempt to factually distinguish Flippins and Pitts, petitioner states:
The instant case does not involve a prisoner challenging a conviction because of suffering under or fearing enhancement on another existing conviction. Blanton claims that he had an unlicensed and ineffective lawyer [emphasis added].... Petitioner's disability is and was established at the very beginning of his trial, deprivation of the assistance of licensed counsel" [emphasis in original].
R.Doc. No. 32 at 16-17.
Petitioner's argument is misplaced. Blanton is, in essence, attempting to address the ongoing civil disability requirement by contending that his underlying claim is more meritorious than the respective claims in Flippins and Pitts. That assertion, however, is irrelevant to the issue of whether the petitioner is suffering from an ongoing civil disability. One cannot sidestep the civil disability requirement, as the petitioner attempts to do, by merely alleging the underlying "claim of error" as his ongoing civil disability.
Blanton alternatively contends that coram nobis relief is appropriate because he is functionally and economically disabled as a result of the conviction. We disagree. His sentence has been served and his civil rights have been restored. Blanton has not contended otherwise. His allegation is nothing more than a reputational or incidental injury which would accompany all convictions and is not an appropriate basis upon which we grant coram nobis relief. This court therefore concludes that the petitioner has not shown an ongoing civil disability.

III.
Let us assume, however, that the petitioner may pursue a writ of error coram nobis. The legal premise of his claim is that only a duly licensed attorney can, under the Sixth Amendment, provide effective assistance of counsel. If the attorney is not licensed, his representation is a per se violation. The petitioner therefore argues that this case turns on a single question of fact. Did McLellan have a law license when he represented Blanton?
Making such a finding, however, is not as simple or as straightforward as it may appear. From the documents presented to this court, it is relatively clear that in 1944, McLellan initially failed the Tennessee Bar Examination. It is unclear, after this failure, when, or if, McLellan ever procured a law license.
In the mid-1970's, the State of Tennessee investigated McLellan as to the propriety of his practicing law. After an anonymous tip claimed that McLellan did not have a law license, the Tennessee Supreme Court interviewed McLellan and appointed an ad hoc investigation committee to make findings of fact. The committee filed a comprehensive *1458 report containing facts both supporting and contradicting whether McLellan ever obtained a license to practice law. The report noted in pertinent part:
Mr. McLellan's competence, ability and reputation as a lawyer appear to be exceptional, not only in his community, but throughout the country in his specialized field of labor law. His leadership in bar activities has reflected great credit not only upon himself, but also upon the profession.
8-25-75 Ad Hoc Committee Report at 12. The committee also noted that the records of the Tennessee Board of Law Examiners have been moved twice since 1944, with some records being discarded. Also, the records of the Board for the year 1944 were "sketchy and apparently incomplete." Nevertheless, the committee ultimately concluded that:
Mr. McLellan could have been issued a license by the Board of Law Examiners after his notification that he failed the June 1944 bar exam, but the absence of any corroborating evidence of this in the records of the Board creates a presumption, rebuttable, that he did not receive such a license.
8-25-75 Ad Hoc Committee Report at 2.
The Supreme Court then sent the matter to the Board of Law Examiners for any action the Board deemed appropriate or necessary. The Board of Law Examiners, finding no proof that McLellan had a license in its records, referred the matter to the Tennessee Attorney General regarding a possible suit to enjoin McLellan from continuing to practice law. The Attorney General decided not to bring suit, and in November 1975, the Board of Law Examiners, concluding it did not have jurisdiction, referred the matter to the Tennessee Bar Association's Unauthorized Practice Committee ("TBA").
The TBA, "[b]ased upon a thorough examination of this matter ... determined that it should not institute, nor be involved in, any legal action against McLellan regarding his status as a licensed attorney." 8-29-77 Letter from TBA to Tennessee Chief Justice. Furthermore, the Board of Law Examiners, in a letter to Chief Justice Henry, indicated that whether McLellan was engaging in the unauthorized practice of law could only be resolved by the Supreme Court's direct action, as the Board had no direct jurisdiction in the matter. 4-10-78 Letter from Board of Law Examiners to Tennessee Chief Justice. Accordingly, and with full knowledge that McLellan was continuing to practice law, the Supreme Court of Tennessee, by Chief Justice Henry, informed McLellan (the letter addressed McLellan as "attorney at law") that the TBA would take no further action in connection with his license to practice law, and "to [his] knowledge, this concludes the controversy." 6-1-78 Letter from Chief Justice to John McLellan. The only subsequent correspondence with respect to McLellan's license to practice was an April 1979 letter from the Board of Law Examiners to the Disciplinary Board of the Tennessee Supreme Court indicating that its records still did not show a license for "John S. McLellan, Jr."
McLellan continued to practice law, including the representation of Governor Blanton in his criminal case. Since the 1975-1978 investigation, the Tennessee Supreme Court and all relevant Tennessee authorities have allowed McLellan to actively engage in the practice of law. They have accepted fees and dues, subjected him to Professional Responsibility rules and canons, and allowed him to enter courtrooms and represent clients. In May 1994, at McLellan's request, the Tennessee Supreme Court transferred his license to disabled status because of poor health. 5-9-94 Order of the Tennessee Supreme Court.
This is where the matter stands today. Blanton now asks us to rule that McLellan never had a law license, and that, as a matter of law, he did not receive effective assistance of counsel as is required by the Sixth Amendment. There is some question, however, whether an inferior federal court has the authority to rule that an attorney has not complied with the state requirements when that state nevertheless permits him to practice law. See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 476, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206 (1983); Scott v. Flowers, 910 F.2d 201, 207 (5th Cir. 1990). Moreover, the notion that Blanton's *1459 constitutional rights depend on a collateral matter involving the conduct of his lawyer thirty years prior to Blanton's indictment is questionable, to say the least.
Thus, before attempting to resolve the factual question, we think it prudent to analyze the legal premise upon which Blanton's claim rests: that only a licensed attorney can satisfy the dictates of the Sixth Amendment. This means that the actual competence of his lawyer does not matter, nor does lack of prejudice to the defendant. Nor, for that matter, does the fairness of the trial. Rather, the defendant is entitled to relief solely because of a technicality. A technicality that may be of constitutional dimension to be sure, but a technicality nonetheless. In short, the defendant's legal premise exalts form over substance. And before we accept it, we should examine it carefully. Therefore, assuming arguendo, that McLellan was not properly licensed by any state, did his representation of Governor Blanton constitute a per se violation of the Sixth Amendment?

IV.
"The Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S. 668, 684, 104 S.Ct. 2052, 2062, 80 L.Ed.2d 674 (1984). Counsel's part in ensuring such a trial arises because of his skill and knowledge, for his expertise accords a defendant "`ample opportunity' to meet the case of the prosecution." Id. at 685, 104 S.Ct. at 2063. Of course, on occasion an attorney's skill and knowledge is inadequate and his performance is poor. If this happens, however, the defendant is not automatically entitled to relief because he may have received a fair trial nonetheless. He therefore must also show that his counsel's ineffectiveness resulted in prejudice. Id. at 687, 104 S.Ct. at 2064. Normally, then, there is a two part test:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Id. at 687, 104 S.Ct. at 2064. Analyzing this case in the Strickland framework, we are presented with two questions. First, can an unlicensed advocate qualify as Sixth Amendment counsel, or must "counsel" be a licensed attorney? And second, assuming arguendo, that the Sixth Amendment requires a law license, was Blanton prejudiced by McLellan's alleged unlicensed status?

A.
With regard to the first issue, the Sixth Circuit has previously held in United States v. Whitesel, 543 F.2d 1176 (6th Cir.1976), cert. denied, 431 U.S. 967, 97 S.Ct. 2924, 53 L.Ed.2d 1062 (1977), that "counsel" under the Sixth Amendment does not necessarily mean a licensed attorney, or an "attorney at law." The court reached this conclusion primarily by comparing the language of the Sixth Amendment with the language of Section 35 of the Judiciary Act of 1789, a contemporaneous statute. It noted that the Sixth Amendment grants defendants assistance of counsel, whereas the Judiciary Act allows defendants "the assistance of such counsel or attorneys at law" as the rules of the court shall permit. Id. at 1179 (emphasis added). The court reasoned that there was therefore a difference between "counsel" and "attorneys at law," and it seemed "probable that the proposers of the Sixth Amendment did not mean to limit representation exclusively to `attorneys at law'." Id. Rather, the courts, through their rules or in their discretion, could allow representation by unlicensed advocates, and these persons would qualify as counsel under the Sixth Amendment.
There was, however, a limit to this discretion. A district court could not in accordance with the Sixth Amendment allow a defendant to be represented by an incompetent layman:
But for a District Judge to exercise his discretion to allow a person to try a case who was not a member of the bar of the court and who had not qualified by taking *1460 the required examination, would at a minimum require a showing that such person was sufficiently learned in the law to be able to adequately represent his client in court.
Id. at 1180.
As the petitioner has pointed out, the Sixth Circuit enunciated this principle of law in a factual context which differs from that of the present case. Whitesel dealt with a tax protector who wanted his accountant, rather than a licensed attorney, to represent him. In the present case, the petitioner contends that he had no idea his advocate was an unlicensed attorney, and that he certainly would not have chosen to be represented by someone without a valid law license.[11]
We do not think these factual distinctions matter in construing the meaning of Sixth Amendment counsel. The Sixth Circuit's interpretation of counsel was based on a comparison of the Sixth Amendment and the Judiciary Act of 1789 and was in no way tied to the specific facts of the case. It would be odd indeed if the original understanding of counsel was one thing when the defendant knew his advocate's status and another when he did not. Thus, Whitesel, regardless of its facts, stands for the proposition that counsel for constitutional purposes does not necessarily mean a licensed practitioner. Rather, the counsel requirement may be fulfilled by an advocate sufficiently learned in the law to be able to adequately represent the defendant. Sixth Amendment counsel, therefore, is a function of an advocate's competence, rather than his position as a state-licensed attorney.
The Supreme Court's decision in Strickland supports this view. One of its main tenets is that possession of a law license does not a "counsel" make.[12]
That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.
Id. at 692, 104 S.Ct. at 2067; see also id. at 687, 104 S.Ct. at 2064 (noting that in order to prove a Sixth Amendment violation, the petitioner must prove that his counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment.")
*1461 The petitioner argues, somewhat inartfully, that competence in the law does not make an advocate "counsel" either. Rather, both a license and competence are necessary to satisfy the Sixth Amendment requirement. Whitesel, which holds that unlicensed advocates can on occasion act as counsel, rejects this position. Moreover, as the Supreme Court has stated, the purpose of the Sixth Amendment is to ensure a fair trial. There is no obvious reason why a law license, issued by any of the fifty states with their widely divergent standards, is absolutely necessary to ensure a fair trial.
According to Strickland, a fair trial is "one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding," Id. at 685, 104 S.Ct. at 2062. As noted above, counsel's role in assuring such a trial is that his skill and knowledge accord a defendant "ample opportunity to meet the case of the prosecution." These are substantive standards that have nothing to do with an attorney's formal education and compliance with state licensing procedures. A seasoned attorney who has been trying cases for thirty years no doubt has more "skill and knowledge" than an inexperienced neophyte who has yet to enter a courtroom, even if the neophyte graduated from Yale and the seasoned attorney had no formal legal education. There is little doubt who the accused would rather have by his side. If the purpose of the Sixth Amendment is to assure a defendant a fair trial, then legal credentials make little difference. The quality of the defense the advocate provides is dispositive, not his resume.[13]

B.
Several pre-Strickland cases disagree with the position announced in Whitesel, holding instead that only a duly licensed attorney can qualify as Sixth Amendment counsel. Most notably, there is Judge Friendly's opinion in Solina v. United States, 709 F.2d 160 (2d Cir.1983). Although this court is bound by the legal principles announced in Whitesel, because Solina criticizes its reasoning, and because the petitioner relies so heavily on the case, Solina will be discussed at some length.
The facts of Solina are similar to facts Blanton alleges here. The defendant was convicted of bank robbery and was represented at trial by a labor law "attorney," who, despite his extensive experience, had neither passed a bar exam nor been admitted to practice law in any state. Moreover, the defendant was unaware of this fact. Sometime after the defendant's trial, his advocate pled guilty to practicing law without a license, and the defendant brought a habeas corpus action claiming that he was denied his Sixth Amendment right to assistance of counsel. The district court denied the writ, concluding that any error in permitting the advocate to represent the defendant was harmless. The Second Circuit reversed.
The analysis employed by the Second Circuit in granting the writ of habeas corpus contained two main premises. The major premise was that assistance of counsel was a jurisdictional prerequisite to a valid conviction.[14] The minor premise was that only a *1462 duly licensed attorney could provide assistance of counsel. From these premises, the court concluded that there was a per se rule: if a defendant's advocate did not possess a law license, the conviction must be vacated because the trial court did not have jurisdiction to hear the case. Id. at 169.
Only Solina's minor premise, that the Sixth Amendment requires a licensed attorney, is implicated in this part of the discussion. Like Whitesel, Solina's interpretation of counsel was based in part on Section 35 of the Judiciary Act of 1789, allowing parties to manage their causes with "the assistance of such counsel or attorneys at law" as the courts permitted. Instead of following Whitesel's lead, however, and inferring that "counsel" must mean something different from "attorneys at law," the Solina court concluded that Congress referred to both "counsel" and "attorneys at law" in § 35 of the Act in order to ensure that both branches of the English legal profession (barristers, or "counsel," and solicitors, or "attorneys") could practice in American courts. The Solina court then went on to cite several other statutes which in its view laid to rest any speculation "that the phrase `assistance of counsel' in the Sixth Amendment was meant to signify anything less than representation by a licensed practitioner." Id. at 167.
Interestingly, in the very next paragraph, the Second Circuit backed away from this holding, stating:
In so construing the original understanding of the term "counsel," we do not intimate that any technical defect in the licensed status of a defendant's representative would amount to a violation of the Sixth Amendment. We limit our decision in this case to situations where, unbeknown to the defendant, his representative was not authorized to practice law in any state, and the lack of such authorization stemmed from the failure to seek it or from its denial for a reason going to legal ability, such as failure to pass a bar examination, or want of moral character.
Id. at 167.
Thus, the true holding of Solina seems to be that assistance of counsel requires "representation by a licensed practitioner," but not really. Technical defects do not count, even though they render the advocate unlicensed to practice law in a very real way, for he commits a crime by doing so. However, the opinion does not explain how this substantive/technical distinction in licensing requirements comports with the original understanding of the Sixth Amendment. Also, if substance is more important that technicalities, as Solina seems to suggest, then it would seem more appropriate to directly examine the advocate's substantive abilities, rather than merely his completion of the "substantive" licensing requirements. Finally, in some situations, it is difficult to distinguish between substantive and technical licensing requirements. For example, are continuing legal education (CLE) requirements substantive or technical? Moreover, states have radically different substantive requirements. Would a person licensed to practice law in Wisconsin (where only graduation from a state law school is required), Bruce A. Green, Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment, 78 IOWA L.REV. 433, 516 n. 59 (1993), meet the substantive requirements to qualify as counsel in Tennessee (which requires law school, the Multistate Professional Responsibility Examination, and the bar examination)? See Reese, 926 F.2d at 670 ("[W]e do not think the details of state law matter: the sixth amendment does not mean one thing in Texas and another in Illinois."). Given these difficulties with the holding of Solina, we do not find that case persuasive.
Furthermore, recent commentary concerning the original understanding of Sixth Amendment counsel suggests that Whitesel's interpretation is in fact correct.[15] Lastly, *1463 Strickland makes clear that a state license does not automatically qualify an advocate as Sixth Amendment counsel.
For all these reasons, we conclude that the Sixth Circuit's Whitesel opinion is not only binding on this court, but is also a correct statement of the law: the Sixth Amendment does not require a licensed attorney, but rather a competent advocate sufficiently learned in the law who is able to, and does, adequately represent the defendant at trial. See Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Whitesel, 543 F.2d at 1180.
The petitioner's advocate, John McLellan, meets this standard. At the time of Blanton's trial, McLellan had been successfully practicing law for over thirty years. In doing so, he had built an impressive resume: He was, among other things, a leading labor law attorney, a past President of the Kingsport Bar Association, a former chairman of the Labor Law section of the Tennessee Bar Association, as well as a former chairman of the committee on Union Administration of the American Bar Association. According to the ad hoc committee initially charged with investigating the licensing dispute, McLellan's "professional competence and service to the Bar have built records of excellence." 8-25-75 Ad Hoc Committee Report at 3. Moreover, the ad hoc committee reported that both state and federal judges had praised McLellan's ability. Finally, there is this court's first hand knowledge. We observed McLellan's ability in representing the petitioner, and his performance was more than adequate. As noted in this court's prior order dismissing Blanton's other claims, the petitioner certainly suffered no prejudice from McLellan's representation.
This court concludes that even if McLellan did not pass the bar or "read the law," his thirty year career successfully practicing law, his impressive resume, and his obvious competence in practicing before this court satisfies the Whitesel standard: At the time McLellan defended Governor Blanton, he was "sufficiently learned in the law to be able to adequately represent his client."

C.
The two-part test announced in Strickland is conjunctive. Thus, assuming arguendo, that Whitesel was wrongly decided and that Solinas interpretation of counsel is correct, under a normal Strickland analysis, the petitioner must still show prejudice.
The petitioner's argument, as best we can interpret it, is that prejudice need not be shown in unlicensed advocate cases. Rather, it should be presumed because, applying Solina's interpretation of counsel, there is an "actual or constructive denial of the assistance of counsel altogether."[16] However, prejudice is only presumed in these cases because:
Prejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.
Strickland, 466 U.S. at 692, 104 S.Ct. at 2067.
These rationales, however, are not present when a petitioner alleges that he was unknowingly represented by a competent, yet unlicensed, advocate. The opposite is true. Prejudice will not be likely because the defendant's advocate will probably provide competent representation. Furthermore, when a defendant is represented, unbeknownst to all, by an unlicensed attorney, the prosecution is not directly responsible, and the impairment of the Sixth Amendment right is not easy for the government to prevent.
In addition, applying a presumed prejudice rule in unlicensed advocate cases would have a detrimental impact on the justice system as a whole. Suppose it is discovered that the most talented and famous criminal defense attorney in this country never received a law license. Under the petitioner's suggested *1464 per se rule, every single conviction in which that attorney was counsel would have to be vacated, regardless of the attorney's unquestioned competence and, in many cases, the defendants' unquestionable guilt. Such a result runs completely contrary to the stated purpose of the Sixth Amendment, which is to provide a fair trial with a reliable result. Thus, even if Solina's interpretation of counsel controlled, we would not adopt a per se rule based on presumed prejudice. In short, we do not believe the Sixth Amendment requires courts to liberate all of an attorney's convicted clients whenever it appears that the attorney may have gained admission to the local bar by questionable means.
In conclusion, we hold that Governor Blanton received effective assistance of counsel because he was represented by a competent advocate, and, under Whitesel, that is all that is required. Furthermore, even if the Solina definition of counsel were binding on this court, we would nevertheless hold that the petitioner must still show that he was prejudiced by his advocate's unlicensed status. The petitioner has shown no prejudice.

V.
Although the Sixth Circuit in Whitesel and the Supreme Court in Strickland have rejected the two main premises of the Solina decision, Solina nevertheless contains an alternative rationale which arguably provides the petitioner with another basis for his claim. In the course of deciding whether a harmless error standard should apply in unlicensed advocate cases, the Solina court stated:
As in the case of joint representation, representation by a person not licensed to practice law "is suspect because of what it tends to prevent the `attorney' from doing". Holloway v. Arkansas, 435 U.S. 475, 489-90, 98 S.Ct. 1173, 1181-82, 55 L.Ed.2d 426 (1978). The problem of representation by a person [unlicensed to practice law] is not simply one of competence  he may very well have greater competence to represent a defendant than some leaders of the profession who are expert in corporate financing or estate planning but have never cross examined a witness  but that he was engaging in a crime. Such a person cannot be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his background and discover his lack of credentials. Yet a criminal defendant is entitled to be represented by someone free from such constraints.
Solina, 709 F.2d at 164 (footnotes omitted).
This is a conflict of interest analysis, and it therefore requires a shift in focus. Under a conflict of interest analysis, Whitesel's and Solina's differing interpretations of the meaning of counsel are beside the point. Rather, the advocate's state of mind controls. When an unlicensed advocate represents a defendant without the permission or knowledge of the court, he perpetrates a fraud on the court. His duty of loyalty to his client may therefore be affected by his desire to protect himself, so the argument goes, for if the advocate presses his client's case too hard, his fraud may be exposed.[17] On the other hand, if the advocate believes he has a law license or that he is otherwise permitted to practice law, there is no conflict of interest. As far as the advocate is concerned, he is not committing a crime and has no reason to give his client less than complete and zealous representation.
This reasoning has been followed by several courts. For example, in United States v. Novak, 903 F.2d 883 (2d Cir.1990), the Second Circuit was presented with a case involving an advocate who had gained admission to the bar through deceit. After the fraud was discovered and the advocate's license was revoked, one of his clients brought a § 2255 action asking that his conviction be reversed. The court did so, basing its decision primarily on the advocate's possible conflict of interest. It noted that "[t]here remained the underlying risk that a vigorous defense could have led to a deeper probe and a discovery *1465 that [the advocate] had not been `duly' admitted" to the state bar. Novak, 903 F.2d at 890.
The Tenth Circuit in United States v. Stevens, 978 F.2d 565 (10th Cir.1992), likewise applied a conflict of interest analysis in a case involving an advocate who represented a defendant while the advocate was unaware that he had been disbarred. In doing so, the Stevens court noted that "the Solina rule derived from conflict of interest concerns rather than competence," and held that where "a licensed attorney is disbarred without notice, that attorney's representation is not per se ineffective." Id. at 567-68; see also Waterhouse v. Rodriguez, 848 F.2d 375, 383 (2d Cir.1988) (refusing to apply the per se rule of Solina when there was no conflict of interest).[18]
Assuming that a conflict of interest analysis is appropriate in unlicensed advocate cases, the petitioner here cannot show a conflict of interest. McLellan has consistently maintained that he possesses a law license. Moreover, when the issue of McLellan's licensure was raised 20 years ago in the mid-1970's, the Tennessee Supreme Court and the appropriate state agencies fully investigated the matter and decided that no action should be taken against McLellan. The evidence was simply insufficient to enjoin McLellan from continuing his 30 year-old law practice.
As a result, the Tennessee Supreme Court, the body ultimately responsible for attorney licensure disputes,[19] informed McLellan by letter in 1978 that he was no longer under investigation and that he could continue his law practice.[20] After the investigation, McLellan continued to receive bar cards from the Board of Professional Responsibility, pay bar dues, represent clients, appear before the courts of Tennessee, and be subject to the Rules and Canons of the Tennessee Code of Professional Responsibility. The only conclusion that McLellan could draw, and that we can draw, from these events is that the state authorities decided that McLellan was authorized to practice law in their state.[21] The petitioner makes much of a letter sent to the Supreme Court from the Board of Law Examiners after the investigation stating that its records showed that *1466 McLellan did not have a license, but there is no suggestion that McLellan was even aware of this letter, much less that it had any effect on his belief that he was authorized to practice law.
At the time of Blanton's trial, McLellan had been investigated by an ad-hoc committee of the State Supreme Court, the Board of Law Examiners, the Tennessee Attorney General, and the Tennessee Bar Association. These investigations had all come to naught, and according to the Chief Justice's letter, the controversy surrounding his licensure had ended. Thus, even if McLellan did not receive a valid law license over fifty years ago, at the time of Blanton's trial he was free and clear of any controversy. He was under no possible conflict of interest because he was out of danger; he would not be punished for practicing law.[22] Thus, the petitioner is not entitled to relief under this alternative rationale.

VI.
As stated, the petitioner urges this court to find that McLellan was a fraud who never received a license to practice law. Blanton points out that McLellan "failed" the 1944 Bar, never retook the exam, and never "read the law." Blanton also contends that the Board of Law Examiners' Records did not list McLellan as passing the Bar. Blanton concludes that "[t]he government has failed to produce any independent, objective evidence that Mr. John S. McLellan, Jr., has a license to practice law in Tennessee. Therefore, this court should find that the Petitioner Blanton was denied counsel at trial...." R. No. 88 at 5.
We disagree. First, it is the petitioner's burden to establish that McLellan was in fact not licensed rather than the government's burden to establish that he was licensed. Garlotte v. Fordice, ___ U.S. ___, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995). Second, and more importantly, Blanton's contention raises the question of whether we should as a federal district court determine whether a person is or is not authorized to practice law in a particular state when the state and its appropriate authorities have investigated and addressed the issue and have determined that such person is authorized to practice law. Until the appropriate state authority holds that McLellan is or was not authorized to practice law before the courts of Tennessee, we do not see how a federal court can hold otherwise.
We note that, as an initial matter, neither Solina nor Novak provide support for Blanton's position. In both Solina and Novak, the trial attorneys involved had been either disbarred or deemed "unqualified" to practice law by the proper state licensing authority before the petitions to vacate the convictions were filed. In Novak, for example, the federal court found for the petitioner on his ineffective assistance of counsel claim, relying entirely on the state court's determination to disbar the petitioner's attorney. The district court never made any independent determination as to the attorney's licensure. Blanton, however, disregards that aspect of the case. In the instant case, the only determination made by the Tennessee Supreme Court was that McLellan was authorized to continue practicing law. At the time he represented Blanton, McLellan was registered as an attorney with the Board of Professional Responsibility, was regulated by that Board, and paid bar dues and membership fees. Moreover, the challenge to McLellan's right to practice law was resolved two years before he represented Blanton. Thus, McLellan was duly authorized to practice law in the State of Tennessee during the entire time that he handled the petitioner's criminal case.
At bottom, the petitioner would have us rely on the files and records of some of the Tennessee authorities, most notably the Board of Law Examiners, yet on the other hand, ignore the ultimate determinations of all the appropriate Tennessee authorities that McLellan was in fact qualified to continue practicing law. We simply do not have, and for that matter refuse to accept, the authority to effectively go behind the determinations of the Tennessee Supreme Court *1467 and other relevant state authorities and make our "own determination" as to whether McLellan was in fact authorized to practice law before the Tennessee courts. Reese v. Peters, 926 F.2d 668 (7th Cir.1991) ("The constitutional question is whether the court has satisfied itself of the advocate's competence and authorized him to practice law.... What matters for constitutional purposes is that the legal representative was enrolled after the court concluded that he was fit to render legal assistance."). The petitioner cannot seriously be suggesting that a federal court may as a practical matter "overrule" the Tennessee Supreme Court's own determination as to who is "qualified" and therefore authorized to practice before the courts of its state. Under petitioner's reasoning, for example, a defendant challenging his conviction could contend that the state board of law examiners graded his attorney's bar exam incorrectly, and therefore, his attorney really did not pass the bar. The petitioner would seemingly be asking this court to go behind the state board and independently "regrade" the attorney's exam to determine whether the petitioner's Sixth Amendment rights were protected. Likewise, a defendant could challenge his conviction arguing that the state supreme court erred in authorizing his attorney to practice law because the "attorney" was a convicted felon and should have "failed" the moral fitness requirement to be a licensed attorney. The scenarios are endless.[23] Simply put, this is an allegation that is within the province of the state supreme court and its duly appointed agencies. See Saier v. State Bar of Michigan, 293 F.2d 756 (6th Cir.1961) (holding that regulation of licenses to practice law are within the province of states).
Moreover, as a practical matter, we do not see how we are better suited in 1995 than the Tennessee Supreme Court was in 1975 to make a determination that McLellan was or was not licensed to practice law in the State of Tennessee. McLellan allegedly procured a license over 50 years ago. The investigation into McLellan's licensure is now over 20 years old. The relevant records are sketchy at best, many witnesses are deceased, incompetent, or have failed memories. Yet, Blanton is asking this court to go back 20 years and, without a shred of new evidence before it, review the decision of the Tennessee Supreme Court relying primarily on the documents that the court and its relevant agencies created as part of its own investigation. This, we refuse to do.

VII.
In light of the breadth and length of today's decision, we think it important to set out two obvious truths this decision does not challenge. The first is that, under Whitesel, courts may of course limit the practice of law in their courtroom to licensed attorneys. The second is that states have a substantial, legitimate interest in regulating the practice of law, and are permitted, and encouraged, to set up licensing requirements to help ensure the integrity of the profession. The thrust of this decision, rather, is that the Sixth Amendment does not require the states, or the federal government for that matter, to set up a plethora of licensing requirements  attendance at an accredited law school, the bar examination, etcetera  and then guarantee that all defense attorneys comply with these requirements in order for a defendant to receive effective assistance of counsel. If an advocate was unauthorized to practice law when he represented a defendant, then he should perhaps be convicted of a crime. It does not necessarily follow, however, that the advocate's crime should automatically result in the cancellation of his client's conviction. Rather, the conviction should stand, and the Sixth Amendment is satisfied, so long as the defendant's advocate was sufficiently learned in the law, provided competent representation, and was not operating under a debilitating conflict of interest.
For all the above reasons, we DISMISS the petition for a writ of error coram nobis. The clerk is ordered to enter judgment accordingly.
NOTES
[1] The indictment contained other charges against Blanton which were severed and never tried.
[2] The jury found Hood not guilty as to the other mail fraud counts and the extortion count.
[3] The jury found Allen not guilty of the other mail fraud counts and the court dismissed the extortion count as to Allen.
[4] After the notices of appeal had been filed by defendants, they filed in the court of appeals an appeal of this court's subsequent order denying their request that it certify that it was inclined, if the case were remanded, to grant their motions for a new trial based on newly discovered evidence. The court of appeals determined that this court's order denying such request was an unappealable order. United States v. Blanton, 697 F.2d 146 (6th Cir.1983).
[5] The Supreme Court in McNally held that the intangible rights theory  where defendants devise a scheme to defraud the citizens of their state of the right to the defendants' loyal, faithful, and honest service as public officers and employees  no longer supported a mail fraud conviction.
[6] By letter to this court dated December 8, 1987, government counsel, by authority from the Solicitor General, conceded that McNally should be given retroactive effect. Prior to our disposition of the motions, Hood died and his widow joined as a petitioner seeking only a refund of the fines paid by him.
[7] Throughout this coram nobis proceeding, we have consistently applied habeas corpus procedural rules.
[8] The government urges us to dismiss the petition on the grounds that, although McLellan was lead counsel, Blanton's other two attorneys were present at all critical stages of the trial. In light of today's analysis, we find it unnecessary to deal with this contention.
[9] Such compelling circumstances could be where the defendant was insane, the conviction was based on a coerced guilty plea, or prosecutorial misconduct.
[10] We recognize that some courts do not adhere as strictly to the civil disability requirement. See United States v. Walgren, 885 F.2d 1417 (9th Cir.1989) (the conviction in question could affect future sentencing, and therefore, "adverse consequences" existed to qualify for coram nobis analysis.); United States v. Mandel, 862 F.2d 1067, 1075 (4th Cir.1988), cert. denied, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989) (In not addressing the civil disability requirement, the Fourth Circuit concluded that a conviction imposes a status which makes a person vulnerable to future sanctions and penalties sufficient to warrant coram nobis review.). Nevertheless, we agree with the majority of circuits which hold that a successful petition for writ of error coram nobis must sufficiently allege and prove an ongoing civil disability above and beyond the normal and incidental effects of being convicted. There must be a concrete threat that an erroneous conviction's ongoing disability causes the petitioner serious harm. Craig, 907 F.2d at 658.
[11] It is difficult to believe that Blanton was unaware of the licensing dispute. The investigation was reported in the media once when it occurred and again when McLellan agreed to represent Blanton. Also, according to McLellan's affidavit, he told Blanton that he had been falsely accused of not possessing a law license.
[12] The Petitioner's attorney provides a perfect example. In his memorandum to this court, he states:

Counsel wishes to inform the Court that the Court has misread United States v. Whitesel, 543 F.2d 1176 (6th Cir.1976). Whitesel is clearly factually distinguishable, and the relevant dicta supports Petitioner. From the Court's comments at the hearing, Petitioner's counsel can only believe the Court's law clerk read only the West's Publishing Company's "headnotes", [sic] particularly note 2, and the Court, in reliance upon the law clerk's representations, then cited the case to Petitioner's counsel.
R.Doc. No. 157 at 8 (emphasis added).
This is an unusual sort of advocacy. Most attorneys would not attempt to win their case by libeling the judge who decides it. The petitioner's attorney has done just that, though, and his law license did not provide him with the wisdom to refrain. Of course, the above quotation is bewildering rather than prejudicial, but it is nevertheless not something one would expect from a competent advocate.
Moreover, in "informing" this court of the import of Whitesel, the petitioner's attorney states:
Importantly, the Sixth Circuit said:
"It is clear that these demands [requirements of the Sixth Amendment] are not satisfied when the accused is `represented' by a layman masquerading as a qualified attorney; it is unthinkable that so precious a right, or so grave a responsibility, can be entrusted to one who has not been admitted to the practice of now, [sic] no matter how intelligent or well educated he may be."
R.Doc. No. 157 at 9. This is a misrepresentation. In making this statement, the Sixth Circuit was citing Harrison v. United States, 387 F.2d 203 (1967), which advocated a position the Sixth Circuit went on to reject. Whitesel, 543 F.2d at 1178 ("Nonetheless [despite Harrison and other cases], the question posed in this appeal remains open to our consideration....").
[13] Petitioner also argues that because Strickland assumes the attorney will be licensed, only licensed attorneys are entitled to Strickland's presumption "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. at 2066. While we agree that licensed attorneys are entitled to the Strickland presumption, we do not think that a license is the only way to gain it. Rather, in accordance with the Whitesel case, an advocate will be entitled to the Strickland presumption if the court finds he is sufficiently learned in the law to be able to adequately represent the defendant. In cases such as this one, where the court does not know of the advocate's alleged lack of a license until many years after the trial, the decision has to be made after the fact. If the advocate met the Whitesel standard at the time of the trial, he is entitled to the Strickland presumption when reviewing the defendant's ineffective assistance of counsel claim. See Reese v. Peters, 926 F.2d 668, 670 (7th Cir. 1991) ("The constitutional question is whether the court has satisfied itself of the advocate's competence and authorized him to practice law.").
[14] The Solina court derived this principle from the Supreme Court's opinion in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). After Solina was decided, however, the Supreme Court clearly departed from the Johnson characterization of the Sixth Amendment. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064 (requiring prejudice for assistance of counsel claims, without describing counsel as a jurisdictional prerequisite to a valid conviction).
[15] Mindy D. Block, Comment: The Criminal Defendant's Sixth Amendment Right to Lay Representation, 52 U.CHI.L.REV. 460, 464 (1985) ("Historical practice suggests that, contrary to modern-day notions, the framers thought of counsel as including lay persons."), Lethal Fiction, supra, at 472 ("When it comes to protecting the interests of the accused, it should not matter whether an advocate has navigated the bar admissions process; what should matter is that, through some means, the advocate has demonstrated the necessary qualifications to provide a competent defense.")
[16] Under Whitesel, of course, Blanton was not denied "actual or constructive" assistance of counsel because he was represented by a competent advocate.
[17] We think this conflict of interest is, at most, a remote possibility. In short, we do not see how, in most circumstances, an advocate could think that his zealous, or even over-zealous, representation of a client could cause a judge or prosecutor to suspect that he is unlicensed to practice law.
[18] The conflict of interest rationale could help explain the technical/substantive distinction in licensing requirements used by some courts. Technical defects, unlike substantive ones, are usually oversights which are easily remedied. They are thus unlikely to cause the type of "actual conflict of interest" which might adversely affect the advocate's representation. See Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).
[19] Blanton contends that the Board of Law Examiners, rather than the Tennessee Supreme Court, is the ultimate arbiter of licensing disputes, and therefore, the actions of the Tennessee Supreme Court are irrelevant. Blanton states that "the Tennessee Supreme Court has no power to admit an individual to the practice of law...." R. No. 53, and has absolutely no power to make any decisions regarding licensure. R. No. 45, at 21. Such contentions are erroneous. The Tennessee Board of Law Examiners is an administrative branch of the Tennessee Supreme Court, not vice versa, and it has no powers independent of those granted to it by the Supreme Court. Blanton's contention that the Board of Law Examiner's records trump the actions of the Tennessee Supreme Court amounts to a claim that the tail wags the dog. S.Ct.R. 37, TENN.CODE ANN. §§ 29-101-110. The right to control and regulate attorney licensure issues is governed by the state supreme courts and their rules. See, e.g., Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917); Ginger v. Circuit Court of Wayne County, 372 F.2d 621 (6th Cir.1967), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967).

Also, as stated, in the 1975-78 investigation, the Tennessee Board of Law Examiners explicitly stated that the matter could only be resolved by the Tennessee Supreme Court's direct action, inasmuch as the Board did not have jurisdiction over the matter.
[20] Blanton continuously argues that a letter from the Tennessee Supreme Court cannot constitute the issuance of a license. That is not the issue. McLellan was not seeking a "license" from the court. He had been practicing law for 30 years at that point. What the letter did do is inform McLellan that the investigation was final and that he could continue with his law practice.
[21] As stated, the Tennessee Supreme Court at McLellan's request transferred his law license to disability inactive status in May of 1994 due to his poor health. Such a procedure necessarily shows that, as far as the State of Tennessee was concerned, McLellan did in fact have a license to practice law.
[22] As stated earlier, the controversy over McLellan's license was rehashed in the media when McLellan took Blanton's case. Taking a case of national interest entailing widespread media exposure is not the act of a man with something to hide.
[23] These scenarios also demonstrate the difficulties with defining Sixth Amendment counsel through reference to a state's licensing requirements.